```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                        SHERMAN DIVISION

 3   UNITED STATES OF AMERICA     )  CAUSE NO. 4:18-CR-103-ALM-CAN
                                  (
 4   vs.                          )
                                  (  FEBRUARY 6, 2020
 5                                )  SHERMAN, TEXAS
     RICHARD BELDEN               (  1:30 P.M.
 6   ─────────────────────────────────────────────────────────────

 7

 8

 9   ─────────────────────────────────────────────────────────────

10                           SENTENCING

11
                 BEFORE THE HONORABLE AMOS L. MAZZANT, III
12                    UNITED STATES DISTRICT JUDGE

13   ─────────────────────────────────────────────────────────────

14
                         A P P E A R A N C E S
15

16
                FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
17                                    101 E. PARK BLVD., SUITE 500
                                      PLANO, TEXAS  75074
18                                    (469) 298-5426
                                      BY:  MS. MARISA MILLER
19
                FOR THE DEFENDANT:    FEDERAL PUBLIC DEFENDER
20                                    600 E. TAYLOR, SUITE 4000
                                      SHERMAN, TEXAS  75090
21                                    (903) 892-4448
                                      BY:  MR. BRIAN O'SHEA
22
          OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
23                                    1100 COMMERCE STREET, RM. 1504
                                      DALLAS, TEXAS  75242
24                                    (214) 753-2349

25
```

1          THE COURT:  Okay.  Our last case on this docket is

2     4:18-CR-103, United States of America versus Richard Denver

3     Belden, and we are here for a sentencing.

4          Is this a continuation -- it was prior -- it was

5     previously set.

6          Let me get the appearances of counsel.

7          For the Government?

8          MS. MILLER:  Marisa Miller for the Government.  Good

9     afternoon, Your Honor.

10          THE COURT:  And then for the Defense?

11          MR. O'SHEA:  Brian O'Shea for Mr. Belden.

12          THE COURT:  So this is a continuation because the

13     Government had filed their motion for upward departure, and so

14     we adjourned for time for the Court to review those videos

15     from the Defendant's -- of the Defendant during the search

16     warrant being executed as well as at least one time where he

17     was in the jail, I think after the discovery of some of those

18     videos.  So I have reviewed all of those.  I read the

19     transcript, but also I reviewed -- I watched those videos, and

20     I also have the Government -- Mr. O'Shea, your sentencing

21     memorandum as well.

22          So are we ready to proceed?  Because I don't think we

23     ever really started the sentencing; we never got there.

24          MR. O'SHEA:  We're ready, Your Honor.

25          MS. MILLER:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  So Mr. Belden, you're here for

 2   your sentencing pursuant to your final presentence report that

 3   was filed in December 17th, 2019.  And have you had a chance

 4   to review the final presentence report, sir?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  Have you had a chance to discuss it with

 7   your counsel?

 8              THE DEFENDANT:  Yes.

 9              THE COURT:  And do you understand it?

10              THE DEFENDANT:  Yes.

11              THE COURT:  And do you believe it adequately covers

12   your background?

13              THE DEFENDANT:  Yes.

14              THE COURT:  And are you satisfied with the accuracy

15   of the report?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Mr. O'Shea, have you had the chance to

18   review the finally presentence report --

19              MR. O'SHEA:  Yes, Your Honor.

20              THE COURT:  Well, let me finish my question.  Have

21   you had a chance to review the final presentence report with

22   your client and do you believe he understands it?

23              MR. O'SHEA:  Yes, Your Honor.

24              THE COURT:  And do you have any comments, additions,

25   or corrections to the report?
```

1          MR. O'SHEA:  No, Your Honor.

2          THE COURT:  And then on behalf of the Government,

3    Ms. Miller, any comments, additions, or corrections to the

4    report?

5          MS. MILLER:  No, Your Honor.

6          THE COURT:  There were no objections by either side.

7          MS. MILLER:  That's correct.

8          MR. O'SHEA:  That's correct.

9          THE COURT:  And, sir, you pleaded guilty to three

10   counts--Count 1, receipt of child pornography; Count 2,

11   possession of child pornography; and Count 3, another charge

12   of possession of child pornography.  To the extent I have not

13   fully accepted the plea agreements, I will fully accept them

14   now.

15         MS. MILLER:  Your Honor?

16         THE COURT:  Yes.

17         MS. MILLER:  Mr. Belden pleaded without a plea

18   agreement.

19         THE COURT:  Oh, I am so sorry.  I'm glad -- it is

20   right here on my notes and I -- sorry I skipped over that.

21         MS. MILLER:  The Court has had a very long docket

22   this afternoon.

23         THE COURT:  Yes, it has.  And that is correct--it

24   was without a plea agreement.  And my staff marked it and I

25   marked it, too, and I still -- in big letters.  But I

1    apologize for that.  Thank you for that correction.

2         So the Court finds the information contained in the

3    presentence report has a sufficient indicia of reliability to

4    support its probable accuracy.  The Court adopts the factual

5    findings, undisputed facts, and the Guideline applications in

6    the presentence report.  Based upon a preponderance of the

7    evidence presented and the facts of the report, while viewing

8    the Sentencing Guidelines as advisory, the Court concludes as

9    follows:

10        Your total offense level is a 37, your Criminal History

11   Category is a I, which provides for an advisory Guideline

12   range of 210 months to 262 months, which under that Guideline

13   range it would be 240 on Count 1, Count 2 would be 240 with 22

14   months to be consecutive, just to understand that concept of

15   where do we get that range to accomplish that range if that's

16   -- and that's what the Guideline range is.

17        Okay.  So I know you -- of course, the Defense usually --

18   I usually call upon you first to go over your matter, but I'm

19   actually going to go in reverse because the Government has

20   filed for an upward departure, so if you don't mind if I

21   change that order and have you go first so that Mr. O'Shea can

22   respond to that.

23             MS. MILLER:  Your Honor, I certainly have remarks to

24   make; however, I do note that Detective Jeff Rich from the

25   Plano Police Department is in the courtroom today, and I think

1    that his testimony may be beneficial to the Court in

2    understanding from Detective Rich's perspective and the work

3    that he did in this case why Mr. Belden is a different

4    defendant.

5                  THE COURT:  That's fine.

6                  MS. MILLER:  Thank you.

7           Then the Government would call Detective Jeffrey Rich.

8                  THE COURT:  If you'll come forward.

9           Sir, if you'll raise your right hand and be sworn in.

10                 (Whereupon, the oath was administered by the Clerk.)

11                 THE COURT:  Come on and have a seat.

12          Go ahead.

13                 MS. MILLER:  Thank you, Your Honor.

14                           JEFFREY RICH,

15   testified on direct examination by Ms. Miller as follows:

16   Q.   Detective Rich, would you introduce yourself to the Court

17   and explain how you're employed?

18   A.   Yes, ma'am.  My name is Jeff Rich.  I'm a police officer

19   for the City of Plano Police Department.  I'm assigned to the

20   Criminal Investigations Division where I investigate internet

21   crimes against children.  I'm also attached to the Violent

22   Crimes Against Children Task Force, the Child Exploitation

23   Tasks Force of the FBI, and cross-deputized as a special

24   deputy U.S. Marshal.

25   Q.   And Detective, looking at your tenure as a whole, how

1    long have you been investigating crimes against children?

2    A.    About 21 years.

3    Q.    And in addition -- well, would you describe for the Court

4    the types of work that you do as far as investigating crimes

5    against children?

6    A.    Yes, ma'am.  My job as an investigator investigating

7    these types of offenses is that I identify and locate

8    individuals who are making files of child pornography or child

9    exploitation material available online, and try to work with

10   software developers and others who create software to

11   investigate these types of cases and then deploy that software

12   as such.

13   Q.    Do you also take a proactive role in certain

14   investigations?

15   A.    I do.

16   Q.    And are you also a trained forensic examiner?

17   A.    I am.

18   Q.    Okay.  Detective Rich, are you familiar with the

19   BitTorrent client software?

20   A.    I am.

21   Q.    And is that a software that is regularly used by

22   individuals who trade child pornography?

23   A.    Yes, that is correct.

24   Q.    Okay.

25   A.    Bittorrent and uTorrent are two client softwares that are

1    the most predominately used on the BitTorrent network.

2    Q.    Okay.  Would you just briefly give a broad overbrush

3    about how those programs work?

4    A.    Yes, ma'am.  As a user seeks to locate whatever type of

5    files they're interested in, they go to what's known as an

6    indexing site, which is a website where they're able to

7    download what's called a torrent file, it ends in .torrent.

8    The torrent file does not contain any of the payload or

9    pictures or videos or any of the software, whatever you might

10   be seeking to download, but it includes instructions on how to

11   obtain those files.

12        Once downloaded, that file is placed into a client

13   software.  That client software then extracts those

14   instructions, goes out to the internet on the BitTorrent

15   network, and then pulls back whatever files the individual

16   user is seeking.

17   Q.    And Detective, as part of your undercover work, have you

18   identified certain torrents that are associated with child

19   pornography payloads?

20   A.    Yes.

21   Q.    And do you have an undercover computer that you use for

22   that purpose?

23   A.    I do.

24   Q.    And turning back your attention to May 9th and 10th of

25   2018, did your undercover computer ultimately connect with an

1    IP address associated with Mr. Belden?

2    A.    Yes.

3    Q.    How many times?

4    A.    Four times.

5    Q.    And the first time, are you aware of approximately how

6    many files you downloaded from Mr. Belden?

7    A.    Approximately, yes.

8    Q.    Okay.  And was that number somewhere in excess of 4,000

9    images --

10   A.    Yes.

11   Q.    -- and videos?

12         Okay.  And are you were you able to identify which

13   particular torrent those files came from?

14   A.    Yes.

15   Q.    With respect to the other three downloads that you made

16   or your undercover computer made from Mr. Belden's IP address,

17   was that the same torrent?

18   A.    It was a different torrent.

19   Q.    And so what does that tell you?

20   A.    Each of the torrents that is represented are indicative

21   of a law enforcement officer or myself who has identified that

22   torrent as being representative of the payload being child

23   exploitation material.  The fact that there were two separate

24   ones indicated to me that that was this goal or what that

25   individual was seeking was files related to child pornography

1   or child exploitation material.

2   Q.   And in two different torrent files.

3   A.   Correct.

4   Q.   So ostensibly, there were likely different videos and

5   images in each.

6   A.   Correct.

7   Q.   And those other three download sessions, were you able to

8   download hundreds if not thousands of files?

9   A.   I was.

10  Q.   Okay.  And based on that information after identifying

11  the IP address and the residence associated with that IP

12  address, did you send that referral to another law enforcement

13  agency?

14  A.   I did.

15  Q.   Who was that?

16  A.   The Collin County Sheriff's Office.

17  Q.   And did they obtain what was ultimately the search

18  warrant for Mr. Belden's residence?

19  A.   That's correct.

20  Q.   Did you assist in the execution of the search warrant on

21  that day?

22  A.   I did.

23  Q.   Okay.  And at that time, did you yourself have a body

24  cam?

25  A.   I did.

```
 1    Q.    Okay.  And would it be accurate to say that you and the

 2    members of the Collin County Sheriff's Office were actually

 3    sharing body cam that day?

 4    A.    We had one body camera amongst the three of us, yes.

 5    Q.    Okay.  And hence why it moves from different individuals.

 6    Is that correct?

 7    A.    Correct.

 8    Q.    Okay.  And did you have an opportunity to speak with

 9    Mr. Belden outside of his apartment?

10    A.    I did.

11    Q.    Would you describe his demeanor?

12    A.    The word escapes me.  Very matter of fact in his nature,

13    very dismissive, minimizing the situation as much as possible,

14    and trying to avoid direct communication about the situation

15    that we were there to speak about.

16    Q.    Once you came into the apartment, did he continue being

17    direct and forthright?

18    A.    Yes.

19    Q.    Okay.  And at that point did he begin to make more

20    admissions about his conduct?

21    A.    Yes.

22    Q.    Okay.  And did he take you to the room where you would

23    find his computers?

24    A.    He did.

25    Q.    What room was that?
```

1    A.   It was an apartment and it was in the bedroom of the

2    apartment.

3    Q.   Okay.  And would you describe for the Court what you saw

4    when you came into the bedroom?

5    A.   The bedroom was in disarray.  There were lots of -- it

6    was clear he was in the IT business.  He had computer parts

7    and hard drives and things and such laying around.  There was

8    a laptop in the bedroom as well as what later was determined

9    to be a computer with multiple hard drives that were running

10   in the computer.

11   Q.   Approximately what time of day was it when you ran the

12   warrant?

13   A.   It was morning.  I would guess somewhere around 6:00 or

14   6:30 in the morning.

15   Q.   And what was your responsibility in running the warrant?

16   A.   My responsibility was to locate and evaluate any digital

17   evidence that may be located there at the scene.

18   Q.   Did you have much interaction with Mr. Belden during the

19   execution of the warrant?

20   A.   Some, but I wouldn't consider it very much.

21   Q.   Okay.  Let's talk about the laptop.  Did you attempt to

22   access the laptop?

23   A.   Yes.

24   Q.   Was it on?

25   A.   Yes.

1  Q.   And what was the first thing you saw when you accessed

2  that laptop?

3  A.   As the -- the laptop was turned on and logged in, and as

4  I looked at it it was running the uTorrent, which is the name

5  of the client software for the BitTorrent network.  It was

6  running that software on the screen actively downloading and

7  uploading files of child pornography.

8  Q.   Meaning that there were files of child pornography coming

9  onto the computer as you were accessing it?

10  A.   Correct.

11  Q.   And there were also files being distributed to other

12  individuals.

13  A.   Correct.

14  Q.   What steps did you take at that point?

15  A.   Being that I didn't want to be responsible for the

16  distribution of child pornography, I immediately disconnected

17  the internet to the house--to the apartment, rather--to

18  disconnect any other -- for uploads or downloads to that

19  location.

20  Q.   And did anyone make any comments about the fact that

21  child pornography was being actively downloaded as well as

22  distributed at that point?

23  A.   Mr. Belden was asked about that, and he agreed that that

24  was the intent.

25  Q.   And were you present -- did you hear him acknowledge

1    that, that he knew that the uTorrent software was running at

2    that moment?

3    A.    Yes.

4    Q.    Okay.  Now, with respect to that laptop, at some point

5    once you minimized the files -- well, first of all, let me ask

6    you this.  Did you confirm whether the files that were

7    actively being downloaded as well as distributed were child

8    pornography?

9    A.    I did.

10   Q.    And were they child pornography?

11   A.    Yes, they were.

12   Q.    At some point did you minimize some of the screens to get

13   back to the desktop of that laptop?

14   A.    I did.

15   Q.    And is an individual able to customize the desktop, the

16   screen that they can see?

17   A.    Generally, yes.

18   Q.    And had Mr. Belden customized his desktop?

19   A.    He had.

20   Q.    What was the image that you see when you access

21   Mr. Belden's desktop?

22   A.    An anime cartoon-type drawing of a minor who is topless

23   and with her legs crossed; basically nude with her legs

24   crossed, but the genitals of the cartoon were not visible

25   because of the way that the image's legs were crossed.

1    Q.    So essentially the sexual depiction of a child, just in

2    cartoon form.

3    A.    Correct.

4    Q.    Okay.  Now, you mentioned that there was another device

5    in the room.  I'm going to call it a tower.  Did you also

6    seize that device?

7    A.    Yes.

8    Q.    And what was inside that tower?

9    A.    Multiple hard drives containing images and videos of

10   child pornography.

11   Q.    And when we say multiple hard drives, does the number 15

12   sound about right?

13   A.    That's correct.

14   Q.    And did any one of those hard drives have less than a

15   terabyte worth of space?

16   A.    No.

17   Q.    Did some of them, in fact, have much more than that?

18   A.    Multiple terabytes.

19   Q.    All told, are we talking about a combined approximately

20   57 terabytes?

21   A.    That's correct.

22   Q.    Okay.  And at that time, were you able to determine

23   whether the laptop had any connection to that tower?

24   A.    Mr. Belden explained to us that he would download the

25   files using the uTorrent software and then would transfer them

1    to this tower computer as if it was a server, although it was

2    not actually a server, but using it as a file storage server

3    he would transfer the files from the laptop to the tower

4    computer onto those hard drives.  So there was connectivity is

5    the answer to your question, yes.

6    Q.    Have you ever seen a tower like that?

7    A.    Not with that many hard drives; not in a residence.

8    Q.    Okay.  And did you take that tower back to your lab?

9    A.    I did.

10   Q.    And when you opened it, did you discover anything unusual

11   about the individual hard drives inside?

12   A.    Yes.

13   Q.    Okay.  And were they marked?

14   A.    They were.

15   Q.    How were they marked?

16   A.    Masking tape placed on the outside of the drive and then

17   labeled with a pen.

18   Q.    Okay.  And let's talk a little bit very briefly about the

19   forensic extraction process.

20        When you have a hard drive, what do you do to make that

21   image.

22   A.    So the process that we go through to review a hard drive

23   is that we take that hard drive and we use specialized

24   software and specialized hardware that creates a one-for-one

25   image of that drive or bit-for-bit image of the drive.  We use

1    write blockers to prevent any data going to the drive, and

2    only extracting data from the drive, and so there is a process

3    that we create what's called an E01 file or an E01 file of

4    that drive, which is a forensic image of the drive.

5    Q.   Once that image is created, are you done?

6    A.   Oh, absolutely not.  That's the very first process.

7    Q.   What happens next?

8    A.   So we work only off of the image, we don't work off of

9    the original drive for fear of contamination or something like

10   that.  So the image is then processed through another series

11   of software programs to evaluate and look at the images and

12   videos and other evidentiary artifacts that may be located on

13   each of those drives, and then they're reviewed and bookmarked

14   for any evidentiary value.

15   Q.   Detective, if nothing goes wrong during this process,

16   about how long would it take to forensically image and then

17   run processing software through just to get ready for review a

18   one terabyte hard drive?

19   A.   To image a one terabyte drive would probably take 8 to

20   10, maybe 12 hours; to do the processing of that drive would

21   probably take another eight hours or 10 hours; and then to

22   forensically review the hundreds upon thousands of files that

23   would be contained on that drive, maybe a couple of days,

24   three days, four days maybe.

25   Q.   And so if you're talking about, say, an eight terabyte

1    hard drive, are we talking exponentially longer?

2    A.    Oh, absolutely, yes.

3    Q.    Okay.  Now, in this case were there hiccups?

4    A.    Yes.

5    Q.    Would you just describe for the Court what those hiccups

6    were?

7    A.    Due to the volume that we were looking at and trying to

8    image, as the process moved through each of the drives, it

9    would encounter bad sectors and the drive failing, parts of

10   the drive, and it would tend to work on those drives trying to

11   make an exact duplicate of that drive, and at times it would

12   cause the software to crash, which would cause me to have to

13   start over the process of imaging that drive.

14   Q.    Detective, when you began, did you have 57 terabytes of

15   free space to create an image?

16   A.    I had 64 terabytes of space in my office total to contain

17   all of the other cases that I had.  I did not have spare 57

18   terabytes or the amount it would take to process that.

19   Q.    So what did you do just to process the evidence in this

20   case?

21   A.    We had to purchase storage.  I bought several thousand

22   dollars worth of storage medium to be able to contain the

23   contents of those drives and the images and the work product

24   related to processing them.

25   Q.    Okay.  All in all, would it be fair to say it took the

1    better part of a year to do the forensics in this case?

2    A.    That's correct.

3    Q.    Okay.  And do you employ some forensic software that

4    helps you identify off the first cut known files of child

5    pornography?

6    A.    I do.

7    Q.    And after that first cut is made, must you still go

8    through each file thereafter to identify files of child

9    pornography?

10   A.    Absolutely, yes.

11   Q.    Okay.  And would it be correct to say in this case that

12   you had in excess of 3,000, in fact, almost 4,000 images and

13   videos of child pornography that you've identified on that

14   first cut?

15   A.    That's correct.

16   Q.    And did you also identify files that we kind of

17   colloquially called child erotica?

18   A.    I did.

19   Q.    Would you explain to the Court what you categorize child

20   erotica as?

21   A.    So we categorize child erotica images as perhaps those

22   that don't meet the legal definition of child pornography.  So

23   the lewd and lascivious display of the genitals is the federal

24   definition, and if it does not contain that type of an image,

25   so perhaps a modeling image, a beach picture, something like

1    that where the children involved in it are nude or engaged in

2    some sort of conduct, but not necessarily meeting that federal

3    definition of the term, we would categorize that as a category

4    2 or a child erotica-type image or video.

5    Q.    And in this case did you identify more than a hundred

6    thousand images and videos of child erotica?

7    A.    At first swipe, yes.

8    Q.    Okay.  And would it be fair to say that this is a

9    difficult process to get exactly right?

10   A.    Yes.

11   Q.    And given the amount of time, is it feasible that you

12   have missed child pornography?

13   A.    Yes.

14   Q.    Okay.  And when we talk about the organization, would it

15   be fair to say that Mr. Belden was a highly organized

16   individual?

17   A.    Absolutely; definitely correct.

18   Q.    Would you describe the file structure?

19   A.    The file structure, each of the drives was labeled both

20   on the outside of the drive and then internally named by that

21   same name, and they were categorized by the type of images or

22   videos that were collected on that drive; so very

23   well-organized and very well-categorized by folder structure.

24   Q.    Okay.  And on one side, did you find images and videos of

25   child pornography that are, lets say, the lascivious

1    exhibition; just children posed in sexually suggestive ways?

2    Is that correct?

3    A.    Yes, ma'am.

4    Q.    Did you also find images and videos of known child

5    pornography?

6    A.    I did.

7    Q.    And Special Agent, are you familiar with the indictment

8    in this case?

9    A.    I am.

10   Q.    In fact, did you aid in its preparation?

11   A.    I did.

12   Q.    And are at least two of the victims whose images are

13   depicted in this indictment well-known to law enforcement?

14   A.    They are.

15   Q.    Okay.  Now, Special Agent, at some point after you seized

16   all those items and took them back to your lab, did you begin

17   with a preview of the laptop?

18   A.    I started the process of imaging and reviewing with the

19   laptop computer because, frankly, it had the smallest hard

20   drive and that was the easiest to start with.

21   Q.    And it was on at the time you arrived.  Correct?

22   A.    Correct.

23   Q.    Okay.  And I think we've already established, you found

24   child pornography on that device.  Is that correct?

25   A.    Correct.  Yes, ma'am.

1   Q.   Okay.  And did you also find a file of what I will call

2   gore videos?

3   A.   A folder, yes.

4   Q.   And where was that folder located?

5   A.   On the root directory of that hard drive in a folder.

6   Q.   User created, then?

7   A.   Correct.

8   Q.   Okay.  And approximately how many videos are inside?

9   A.   I believe there were four videos, perhaps -- I think it

10  was four or five videos.

11  Q.   And are you familiar with the file titles of any of those

12  videos?

13  A.   Yes.

14  Q.   Would you share those with the Court?

15  A.   I'm paraphrasing, but one was young boy decapitated with

16  dull machete.  Another one was school girl run over by bus.

17  Another one was -- I don't remember the exact name; something

18  to the effect of a female decapitated.  I don't remember the

19  fourth.  I'm sorry.

20  Q.   Okay.  Detective, did you watch these videos?

21  A.   I watched part of them.

22  Q.   Were you not able to watch the whole thing?

23  A.   I was not.

24  Q.   Have you ever seen anything like this before?

25  A.   I have not.

1    Q.   Are these animated?

2    A.   No.

3    Q.   Do they appear to be computer generated?

4    A.   Absolutely not.

5    Q.   Do they have sound?

6    A.   Yes.

7    Q.   Would you just generally describe what these videos

8    contain?

9    A.   The first video that I watched was of a young boy,

10   probably seven to nine years old.  He was -- it appears that

11   there was trees behind him.  He was -- initially in the video

12   he was speaking, communicating with somebody.  The video --

13   I'm sorry -- the audio cuts in and out on this video.  The

14   video cuts and then comes back and there is -- the boy is

15   covered in blood.  He raises his arm up and you can see that

16   his arm has been chopped off or removed at the elbow.  The

17   male subject that is talking to him grabs him by the hair and

18   takes a machete and starts hacking at his neck to eventually

19   decapitate him, and I had to turn it off after that.

20   Q.   Okay.  Detective, at that point did you alert other

21   members of law enforcement?

22   A.   I did.

23   Q.   Who did you alert?

24   A.   I -- the detectives from the sheriff's office, I

25   contacted them because they were at the sheriff's office and

1    near the jail, and let them know what I had found on the

2    computer.

3    Q.    Would that be Investigators Meehan and Lanier?

4    A.    Correct.

5              MS. MILLER:  I'll tender the witness, Your Honor.

6              THE COURT:  Cross examination?  No questions?

7              MR. O'SHEA:  No, Your Honor.

8              THE COURT:  Okay.  You may step down.  Thank you.

9              THE COURT:  Is that all the testimony?

10             MS. MILLER:  That is the extent of the proof that

11   the Government -- obviously the Government references the

12   transcripts as well as the video recordings that have been

13   introduced.  The PSR is obviously extensively written in this

14   case, so the Government does not seek to admit any additional

15   proof.  I just have argument.  Would the Court like me to

16   proceed first?

17             THE COURT:  Yes, go ahead and go first, only because

18   you're seeking an upward departure, so.

19             MS. MILLER:  I am, Your Honor.

20        And in this case, starting with the Guidelines, I think

21   it's fairly obvious in this case, and it hasn't been

22   contested, but I do recognize that there is an opportunity

23   here for Mr. Belden to plead, so I just will note that

24   obviously we have plenty of prepubescent minors, as indicated

25   not only in the indictment but as well as in Detective Rich's

1   testimony.  In fact, I think one of the descriptions in the

2   indictment--yes, it's for Count 2 -- excuse me -- Count

3   3--even references that it does involve a toddler.

4        With respect to the distribution, both the testimony as

5   well as Mr. Belden's statements in the interviews that have

6   been transcribed is that he fully knew how the uTorrent and

7   BitTorrent software program worked, and that he knew that he

8   was distributing to other individuals.

9        Talking next about the sadistic/masochistic conduct, it

10  is clear one of the videos that is written in Count 3 of the

11  indictment is well-known by law enforcement, and it -- there

12  is no other way to describe it than to say that it is the

13  torture of a toddler.

14       The use of a computer here, obviously we have more

15  computers I think here in this case than Detective Rich had in

16  all of his other cases combined, or at least the scope of it.

17       And finally, to note the quantity of images here.

18       And I had Detective Rich note the child erotica, too; not

19  that that should be counted against Mr. Belden, but to add to

20  the complete picture of why we're here.

21       And the Government's motion, whether it be captioned as a

22  motion for an upward variance or for an upward departure, is

23  simply for the fact that the Guidelines do not capture the

24  breadth of this Defendant, his nature and circumstances -- his

25  history and circumstances, as well as the nature of the

1    offense, and Your Honor, quite frankly, the danger that the

2    Government believes that he poses to the community.

3         This is an individual who's entire life, even by the

4    Defense's own filing, is rooted around two things--the

5    computer programming that he does--which, to be clear, those

6    57 terabytes are not all child pornography; a substantial

7    portion of those hard drives were his programming efforts--but

8    the other side of his life is child pornography.

9         This is an individual who is so brazen about his sexual

10   attraction to children that he has a graphic cartoon, which I

11   think is probably the wrong word to call it, of child

12   pornography on the desktop of his computer.  Public for

13   everyone to see, he has the nude representation of a child on

14   his desktop computer.

15        He indicates to the agents and the officers -- excuse

16   me -- repeatedly that he has a problem.  I have a problem.

17   And he's talked about 20 years worth of activity and over and

18   over again.  And I note what's really concerning to the

19   Government, paragraph 64 of the PSR, there is an indication

20   that in 2017, a year before the officers executed the search

21   warrant in this case, that the Defendant did receive mental

22   health counseling for other issues, but that as part of that

23   counseling, that she noted that she believed that the

24   Defendant suffered from pedophilic thoughts, and tried to

25   refer Mr. Belden to someone else for further treatment, and he

1    didn't.

2         And as the Court saw and read in the transcript, when the

3    officers said to him again and again, It's over now, there is

4    an opportunity for you to get treatment and to move past this,

5    he repeatedly said, Treatment would be useless for me.  This

6    is who I am.  This is the way that I am.

7         He's admitted that he masturbates to images as young as

8    seven.  He said that he initially liked what we call the L.S.

9    models style of child pornography, the posed erotic.  But if

10   we look at the indictment and the files that he's moved onto,

11   that he was downloading, in fact, Mr. Belden himself with the

12   officers distinguished between child pornography and hardcore

13   child pornography; hardcore meaning the actual penetration or

14   physical abuse of a child.

15        And what really concerns the Government in this case,

16   Your Honor, is the fact that this has been -- his entire life

17   is a sexual interest in children.  All of his computers are

18   geared up this way.  And he is so engaged in this mechanism of

19   child pornography that at 6:00 a.m. when the officers hit the

20   door, he's already trading, he's downloading new child

21   pornography and sharing with other people and freely admitting

22   it.

23        And the Government's concern is about not only about the

24   escalation that we have seen here, but the fact that, unlike

25   so many other defendants, Mr. Belden has shown no shame for

1    his conduct.  He was quite frank with the officers--This is

2    who I am; and, in fact, I feel persecuted because I'm sexually

3    attracted to children.  He shows no remorse for his conduct.

4    In fact, he even asks the officers, Why aren't you going out

5    and catching the real perpetrators, when he's the one feeding

6    the beast the desire, the marketplace for more of these

7    images.  He expresses no desire for change.  The officers

8    repeatedly try to engage him in conversations about therapy

9    and change and moving past, and he is unreceptive to it all.

10        And even worse, Your Honor, he seems to victimize

11    himself.  At some point--you've now seen the video--he just

12    sits down and almost his exchange with law enforcement is, Woe

13    is me that I'm even in this position.  And Your Honor, that's

14    what frightens the Government.  Long time history, serious

15    conduct, a real danger to the community.

16        So it is the Government's request that wherever the Court

17    sentences the Defendant, that the Court not depart downward

18    because his conduct does not warrant a downward departure.

19    But the Government is asking that the Court impose a sentence

20    that truly does reflect the nature of this offense, the

21    seriousness of it, this Defendant's own history, and his own

22    attitude when faced with the conduct, and the need to provide

23    him not only with just deterrence and just punishments, but to

24    protect the community.

25        And along those lines, Your Honor, I will add in that the

1    Government would request a lengthy term of supervised release;

2    I think this one at the very minimum 20 years supervised

3    release, because this Defendant needs supervision, he needs

4    accountability, and he needs mental health treatment, whether

5    he believes he does or not, and being within a supervised

6    release structure would aid and make sure that he has access.

7                THE COURT:  And just to be clear, I note the

8    Government asked in their motion for an upward departure for

9    420 months.  Correct?

10               MS. MILLER:  We did, Your Honor.

11               THE COURT:  Is that still what you're asking for?

12               MS. MILLER:  It is what we're asking for.  And to be

13   clear, Your Honor, that was part of the negotiations so the

14   Government being consistent.  And I will be candid with Your

15   Honor and tell the Court that my office really struggled on

16   what to ask for in this case from the very beginning because,

17   quite frankly, I have never seen anyone like Mr. Belden

18   before.  I don't know what it takes to provide just punishment

19   and deterrence for him, as well as protecting the community,

20   as well as hoping to provide for some sort of rehabilitation.

21   I would like to think that Mr. Belden can be rehabilitated.  I

22   don't know that he can.  We are asking for 30 months, but

23   obviously this is a decision entirely with the Court's

24   discretion.

25               THE COURT:  You don't mean months.  You said months.

```
 1              MS. MILLER:  I did not mean months, Your Honor; I
 2   meant years.  I apologize.
 3              THE COURT:  Mr. O'Shea?
 4              MR. O'SHEA:  Your Honor, we'd like to first call
 5   Lonnie and Linda Turner to talk to the Court.
 6              THE COURT:  That's fine.
 7         Mr. O'Shea, are they just going to make a statement?
 8              MR. O'SHEA:  Yes, Your Honor.
 9              THE COURT:  If you'll state your name, then, for the
10   record.
11              THE WITNESS:  Yes, Your Honor.  My name is Lonnie
12   Turner, and I'm the father-in-law to Richard.
13         And this person that the Prosecutor has brought forth is
14   no person that I know.  I've known Richard for 17 years, and
15   he's been a very kind individual.  He's never been in trouble
16   before.
17         And I realize that he probably does have a problem with
18   his child pornography, but as far as his demeanor and his --
19   like I said, he's never showed any side of that way of life to
20   us as his father-in-law and mother-in-law here.  And I just --
21   it's just hard for me to believe that he's of any kind of a
22   criminal -- hardened criminal, as the Prosecutor wants to
23   make everybody to believe.
24         And so he's just like a big gentle giant when you meet
25   him and have something to do with him.  We've had projects
```

1    we've worked on before, and you know, he's always been very

2    receptive of the things that we want to do, and has never

3    showed any problems with being angry or difficult to work

4    with, and it's just hard for me to believe that all the stuff

5    that I've heard here today is the same person that I know.

6         I guess that's about all I got to say.

7              THE COURT:  Thank you.

8         And ma'am, if you'll state your name.

9              THE WITNESS:  Yes.  Linda Turner.

10             THE COURT:  If you will speak into the microphone.

11             THE WITNESS:  Linda Turner.

12             THE COURT:  Thank you.

13             THE WITNESS:  I don't have much to add to that.  We

14   really -- once we met Richard and got to know him, we accepted

15   him into our family.  He was able to really show a lot of

16   affection for us.  We'd take family trips together, and he's

17   just a really nice guy, other than his issues that he may

18   have.

19             THE COURT:  Thank you, ma'am.  You can go ahead and

20   be seated.

21        Sir, Mr. Belden, if you want to go ahead and take the

22   podium again.

23        And Mr. O'Shea?

24             MR. O'SHEA:  Your Honor, I provided the Court a

25   sentencing memo --

1          THE COURT:  Yes, I have reviewed that.

2          MR. O'SHEA:  -- with some exhibits and the videos.

3   Outside of my arguments in the sentencing memo, which I

4   provided the Court a lot of information, I know this is a big

5   area of the law, so I didn't mean to overwhelm the Court with

6   a bunch of cases and articles.

7          But with respect to this case, this -- I cited a case

8   down in Houston, and I wanted to make sure that I wasn't

9   asking the Court to go on some mindless uniformity as far as

10  the disparate argument.  That case also contained -- down

11  there, it was a fairly recent case, and I think that it also

12  encompasses a lot of the factors that typically exist in this

13  case, and I don't -- and Mr. Belden was kind of tied to this

14  addiction for many, many years, as the Prosecutor said.

15         And along those lines, from the neuroscience that I'm

16  reading, the hoarding aspect is a part of it.  I think that

17  the Court can see from the videos what kind of situation he

18  had as far as.  Whether or not he was sharing this with the

19  world or trying to hide it, I think it's pretty obvious he was

20  trying to hide it.  There's no evidence that he took this

21  outside of his apartment.

22         When he was encountered by the police outside of his

23  apartment, I guess you could characterize it as someone who's

24  indifferent.  You know, I saw someone who just saw their world

25  kind of crumbling down.  At one point right before he lets

1  them in, you can see his Adam's apple almost come out of his

2  throat.

3       I just liken this -- and I've talked to Mr. Belden a

4  bunch, and this is -- the Turners described that's who he is.

5  He's extremely remorseful.  He's never committed any type of

6  crime in his life, so this is just devastated him.  And I

7  think that when he was encountered by the police--which I

8  appreciate your coming down, the work you do--they're

9  obviously trained at this, the BitTorrents, which was

10 characterized as distribution, but my understanding is it's

11 this collection out there that you can download these

12 BitTorrents and actually collect--and it's called

13 seeding--while you're everyone away from your computer,

14 because the download speeds can vary.  And so he's downloading

15 stuff and probably eating dinner.  That's how crazy it is.

16      So, you know, to hold him accountable as far as that, to

17 characterize his entire life from the worst hour or 40 years

18 of his life, and how he was confronted by very sophisticated

19 police officers who obviously deal in this area for a long

20 time, I don't think it's -- I hope it's something the Court

21 doesn't base its decision on that one hour.  And that's why I

22 think the video was important.  He's obviously struggling to

23 come to terms with what's going on.

24      The Prosecutor rightly pointed out that he did seek some

25 sort of counseling.  The Turners mentioned this to me, too.

```
1    I've talked to them.  The problem I think he -- it's something
2    -- I guess it's such a terrible addiction, you just want to
3    hide it, which makes sense.  You know that if you tell anyone,
4    they're probably going to have to call the police if have you
5    have any knowledge of sexual abuse, which Mr. Belden obviously
6    is intelligent enough to know that.  So I'm not sure there is
7    anywhere someone who with this kind of addiction can seek any
8    help in society.  I just don't think it exists, even if they
9    want to seek help.
10        With respect to the time and the Guidelines, I've tried
11   to show the Court what's happening with the -- what's
12   happening across the country with these statistics.
13   Mr. Belden seems to fit into the average.  I guess some of the
14   things he's got on his computer take him outside of that range
15   a little bit, but in the case down in Houston there were also
16   some pretty graphic toddler images or videos.  And as far as
17   the quantity, they're pretty similar to that 151-month
18   sentence.
19        I read the sentencing transcript, and the judge was
20   pretty upset about -- you know, because that person actually
21   had daughters, and the judge was asking him, How can you watch
22   a toddler being raped when you have daughters, and I don't
23   know how you answer that.  So this is obviously an
24   emotional-type of offense.
25        I don't think anyone is irredeemable.  Mr. Belden
```

1    certainly isn't.  I know he wants to try to come to grips with

2    this and move on with his life.  The Guideline range in and of

3    itself basically is pretty much a life sentence.  We've asked

4    for a downward departure.  151 months is still a very

5    substantial sentence, Your Honor.  He'll be over 50 when he

6    gets out if you were to give him that.

7         So if I could just have a second, Your Honor.

8              THE COURT:  Yes.  Go ahead.

9              MR. O'SHEA:  You know, really, outside of my

10   sentencing memo, which I tried to incorporate some of the

11   latest news and science on this as far as the neuropsychology

12   and where this is coming, just personal observation, I think

13   the Court is going to see a lot more of this as far as

14   addictive personality and people staring at their phone and

15   whatever comes across the internet is -- I think it really is

16   an addiction.  And when the articles talk about the MRI

17   imaging, that some parts of the frontal lobe light up when

18   they look at child porn versus when they take cocaine, that's

19   pretty sad when you think about people looking at their phones

20   and being trained that way.

21        So we ask for a reasonable sentence, Your Honor, in line

22   with what the average statistics are for this type of

23   situation.

24        And that's all I have, Your Honor.

25             THE COURT:  Thank you, Mr. O'Shea.

1    Anything else for the Government before I call upon the

2    Defendant?

3          MS. MILLER:  Yes, Your Honor.  I would just like to

4    ask one question here.

5    Mr. O'Shea has referenced now some neuroscience, and I

6    know there was a reference in his motion to -- I think the

7    statement was inability to control addiction on the basis of

8    diminished capacity.  So I would just like to make clear that

9    there is no claim here that Mr. Belden is somehow not mentally

10   fit or understanding of what's happening here or what he's

11   pleaded to.

12         THE COURT:  Right.  I understand that.  And I don't

13   think Mr. O'Shea is asserting that.

14         MR. O'SHEA:  No.  Those cases, Your Honor, were

15   dealing with -- in fact, the Protect Act disallowed downward

16   departures for that type of thing.  However, under 3553, I

17   think when talking about addiction and hoarding, it is a

18   mental illness, so in that respect that's the only time

19   -- that's what I'm trying to impress upon the Court.

20         THE COURT:  Thank you.

21   Okay.  So Mr. Belden, as your right, you have the right

22   to say anything you want to say prior to sentencing.  Now will

23   be the time for you to share anything you would like to say

24   before the Court has to decide how much time to give you.

25         THE DEFENDANT:  Thank you, Your Honor.

1        Finding words for this is kind of a mess.

2        I do want to just try to at least have the Court

3    recognize that I am a full person and not just this crime.  It

4    has been a part of my life for a very long time.  It is

5    something I've hidden and it's not something I socialize at

6    all.

7        I do understand and take responsibility for the fact that

8    BitTorrents also distribute while you are downloading, but it

9    was never my intent to go out and trade with anyone.  I've

10    never communicated with anyone.

11        I also want to address the PSR comment about the

12    therapist.  I was actually the one that brought that up to my

13    therapist on two occasions.  That was the first therapist that

14    I've worked with that I felt that I trusted enough to bring

15    that up.  And honestly I expected to go to jail that day.

16    Instead, she said she wasn't qualified and would search for

17    someone else and, unfortunately, I couldn't get the courage to

18    talk to anyone else.

19        So outside of that, you know, I've -- not to justify

20    anything or minimize, I just want to give a quick background.

21    My childhood was very chaotic.  Before seventh grade, I went

22    to 12 different schools and lived in five different states, so

23    I was raised pretty much with no stability.  And as an adult

24    since I've left home, my entire -- the entirety of my life

25    I've tried to get stability and I've tried to kind of, you

1    know, create a purpose and actually be more than what I was

2    raised as.  And my wife and my in-laws were the biggest

3    stability factor in my life.

4        So I've -- aside from this, you know, I'm the first

5    person I know in my family that didn't smoke, didn't abuse

6    drugs or alcohol, didn't -- that did go to college, and that

7    owned a house, and now I'm the first one I know of that will

8    go to prison, so that's pretty disappointing; not a good track

9    record there.

10       But I understand, since I've been here for about 20

11   months, I haven't been able to work with a therapist, but I've

12   been able to get -- glean some information, and I understand

13   kind of a common issue with consumers of this is they don't

14   recognize the impact that simply consuming it or having it

15   available still has on the victim.  And again, I'm not -- I'm

16   taking responsibility, I'm not trying to minimize; I'm just

17   saying I understand that much better now.

18       And, you know, I pretty much told the officers

19   everything, and a lot of it is -- it sounds bad; obviously it

20   is bad.  I wanted help.  I wanted it over.  And when she --

21   when the Prosecutor mentioned that I said I couldn't get help,

22   what I meant is from what I have studied about sexual

23   attraction is the attraction itself cannot be changed.  But my

24   activity, I can get help, I can stop myself, you know, get

25   rehab and be put in an environment where I am not inclined to

1    any of this anymore.  Mostly I'm relieved that this is over,

2    even though this is the worst possible way this could have

3    happened.  And I believe that my life is irreversibly changed

4    and damaged, but it's not ruined.

5        I believe that, given a chance, I can contribute again to

6    society and still serve a purpose outside of just sitting in

7    prison.  And I can do it without any of the issues related for

8    this crime.

9        I do want to apologize to my family, which I think was

10   impacted the most by my actions, and that's tragic considering

11   how much they've done for me.

12            THE COURT:  Okay.  Thank you, sir.

13       One other issue I wanted to ask is the issue of

14   restitution.  Has any agreement been reached?  I know that

15   there was -- well, in the PSR there were three amounts that

16   one --

17            MS. MILLER:  Your Honor, I think I can spare the

18   Court.  There have been some ongoing negotiations between the

19   parties and victims' counsel, and Mr. O'Shea has advised me

20   that Mr. Belden is amenable to those agreements.  I can put

21   them on the record if that's some thing that the Court would

22   be willing to consider.

23            THE COURT:  Yes, if you would.

24            MS. MILLER:  Okay.  With respect to Cinder Block

25   Blue, who is also known as Jane, an agreed-upon restitution of

1    $1,000; the victim Lighthouse 1, also known as Maureen,

2    restitution in the amount of $1,000; and the victim Sweet

3    Sugar, known as Pia, also $1,000.

4              THE COURT:  Okay.  Thank you.

5         And Mr. O'Shea, you concur those are the agreed amount

6    restitution amounts for those three?

7              MR. O'SHEA:  Yes, Your Honor; those are agreed.

8              THE COURT:  Okay.  Any reason why the Court should

9    not pronounce sentence at this time?

10             MS. MILLER:  Not from the Government, Your Honor.

11             MR. O'SHEA:  No, Your Honor.

12             THE COURT:  We're going to take a five-minute break.

13                       (Brief recess.)

14             THE COURT:  Please be seated.

15        So Mr. Belden, you can tell, and I always say this, that

16   sentencing is the most difficult part of what I do in my job,

17   and I take no pleasure sending anybody to jail, but it is part

18   of the job that I've taken an oath to do.  And, of course, the

19   first step that the Court must determine is what is the

20   appropriate Guideline range to do that correctly, and then

21   after I do that, which we've done that in this case and

22   there's no dispute on that, but then my obligation is to

23   determine what is the appropriate sentence for each defendant

24   after that.  The sentence should not be greater than necessary

25   to accomplish the purposes of sentencing set forth in 18

1    United States Code § 3553(a).

2         In reaching the sentence I'm going to impose in your

3    case, I have fully and thoroughly considered all of the

4    ramifications of the Guidelines, I've considered the nature

5    and circumstances of the offenses, I've considered the need

6    for deterrence and promoting the respect for law and for

7    others, I've considered these offenses, and then to promote

8    respect for the law by the Defendant.  I also looked at the

9    need to protect the public from further crimes of the

10   Defendant, and I've also considered your history and

11   characteristics, and I've also considered the victim

12   statements as well here.

13        And considering a non-Guidelines sentence, a variance,

14   the Court looks at the factors set forth in § 3553(a) to

15   determine whether it should deviate from the sentencing

16   Guideline range and, of course, your counsel has asked for a

17   downward variance, and looking over these issues, the Court is

18   not going to go down.  My struggle is -- I'm going to go up,

19   and I'll give you the reasons for that in a second.  The

20   struggle I have is where to go.  The Government asked to go

21   somewhere, Probation says something else, but I'm trying to

22   figure out what is the right amount.

23        I do think there are aggravating circumstances that are

24   not adequately taken into consideration under the Sentencing

25   Guidelines.  The Court agrees with the Government that the

1    nature and circumstances of what your offense has been and

2    your history and characteristics are not adequately

3    represented by the Guidelines.  An upward variance is

4    necessary to protect the community from your crimes, to

5    provide you with just punishment for your offenses, and to

6    provide adequate deterrence against future violations of the

7    law.

8         The Court has watched the videos which captured your

9    interactions with the police when the search warrant was

10   executed, as well as the video of your interview at the jail.

11   You admitted that you had sexual issues and are interested in

12   basically young female children around the age of puberty.

13   You admitted to doing your own sexual acts to yourself to

14   child pornography depicting children that were as young as

15   seven years old in various sexual acts.

16        When the police arrived, as the Government went through

17   with the testimony, you were running torrents, and you

18   admitted to such, showing your ongoing efforts to trade and

19   obtain child pornography, and you were fully aware, as you

20   admitted, that although you were not doing necessarily

21   peer-to-peer sharing, you knew that you were distributing it

22   by running the torrents programming.

23        You also admitted that you -- that there was no help for

24   your sexual preference, and you didn't necessarily see your

25   activity as contributing to the sexual abuse of children, and

1    that is simply wrong.  Every time someone looks at child

2    pornography, that makes that child a victim again.

3        You also felt that it was unfair that there was a stigma

4    attached to your sexual preference--and that's how you

5    described it is your sexual preference--and that was -- and

6    you referenced the fact that at some point in the past some of

7    the sexuality 20 years before, and I can't remember if you

8    used that time frame or not, but you referenced that at some

9    point that wasn't acceptable and that it's more acceptable

10   now, and it's your sexual preference that hasn't gotten there

11   to the point that it should be accepted by society.

12       The other thing is this has been your life.  You have a

13   basically 20-year collection of child pornography, and when

14   you convert all the numbers of the videos, that figure exceeds

15   17,000 images in terms of the conversion.

16       Certainly the Guidelines do not take into consideration

17   the gore videos, which I am not going to describe for the

18   record.  I wish I didn't have to even think about those.  But

19   essentially officers had never seen anything like that, and

20   certainly this Court has not either.

21       I perceive that I have an obligation to protect society

22   and, unfortunately, your entire life has been centered around

23   this child pornography.  And, you know, considering also the

24   issue of the victim impact, this is an extreme aberrant

25   behavior and conduct, and I don't necessarily see any remorse

1    upon this, and because the sheer number of this amount, those

2    are all my justifications for granting a variance up and

3    granting -- well, the Government moved for a departure upward.

4    I am granting a variance upward, and so those are the reasons

5    I've given.  And again, I would just say the Guidelines just

6    do not capture the content of everything you have done and

7    that justifies the increase that I'm about to impose.

8         Pursuant to the Sentencing Reform Act of 1984, having

9    considered the factors noted in 18 U.S.C. §3553(a), and having

10   consulted the advisory Sentencing Guidelines, it is the

11   judgment of the Court the Defendant, Richard Denver Belden, is

12   hereby committed to the custody of the Bureau of Prisons to be

13   imprisoned for the total term of 420 months.  The term

14   consists of 240 months on Count 1; 240 months on Count 2, with

15   180 months to be served consecutively to Count 1; and 240

16   months on Count 3 to be served concurrently to Count 1 of the

17   indictment.

18        The Court recommends to the Bureau of Prisons that you

19   receive appropriate sex offender treatment while in prison.

20        While incarcerated, it is recommended that you

21   participate in the Inmate Financial Responsibility Program at

22   a rate determined by the Bureau of Prisons staff in accordance

23   with the requirement of the Inmate Financial Responsibility

24   Program.

25        It's further ordered that you make restitution totaling

1    $3,000 to the victims listed in the restitution section, with

2    $1,000 for each of the three victims, since the amounts

3    usually refer back to the way it's listed in the presentence

4    report, but since we have agreed upon a thousand for each of

5    the three victims.

6        The Court finds you don't have the ability to pay

7    interest.  I'll waive the interest requirement in this case.

8        It is ordered you pay the United States a special

9    assessment of $300, which is $100 per count, which is due and

10   payable immediately.

11       It's further ordered that the defendant must pay an

12   assessment of $15,000 pursuant to the Justice for Victims of

13   Trafficking Act of 2015 and 18 U.S.C. § 3014.  Any monetary

14   penalty that remains unpaid when the Defendant's supervision

15   commences is paid on a monthly basis at the rate of at least

16   10 percent of the Defendant's.  The percentage of gross income

17   to be paid with respect to any restitution and a fine is to be

18   changed during supervision if needed based on the Defendant's

19   change of circumstances pursuant to 18 U.S.C. §3664(k) and/or

20   18 U.S.C. § 3572(d)(3) respectively.

21       If the Defendant receives any inheritance, any

22   settlements, a divorce settlement, personal injury settlement,

23   gifts, tax refunds, bonuses, lawsuit awards, and any other

24   receipt, not limited to gambling proceeds, lottery winnings,

25   and money found or discovered, the Defendant must within five

1    days of receipt apply 100 percent of the value of such

2    resources to any financial penalty ordered.

3        Upon release from imprisonment, the Defendant shall be

4    placed on supervised release for a term of 20 years.  This

5    consists of a term of 20 years on each of Counts 1, 2, and 3

6    of the indictment.  All such terms to run concurrently.

7        Within 72 hours of release from the custody of the Bureau

8    of Prisons, the Defendant must report in person to the

9    Probation Office in the district to which the Defendant is

10   released.

11       The Defendant must not commit another federal, state, or

12   local crime, and must comply with the standard conditions that

13   have been adopted by the Court.  In addition, the Defendant

14   must comply with all mandatory conditions and the following

15   special conditions:

16       The Defendant must provide the Probation officer with

17   access to any requested financial information for purpose of

18   monitoring your efforts to obtain and maintain lawful

19   employment.

20       You must participate in a sex offender treatment program,

21   which may include the application of psychological testing

22   instruments.  The Defendant must abide by all the rules and

23   regulations of the treatment program until discharged.  The

24   Probation officer, in consultation with the treatment

25   provider, will supervise your participation in the program.

1    Defendant must pay any costs associated with treatment and

2    testing.  Should the Defendant fail to pay as directed, the

3    Defendant must perform three hours of community service for

4    each unpaid session.

5         The Defendant must not have contact of any kind with

6    children under the age of 18, unless supervised by an adult

7    approved by the Probation officer.

8         The Defendant must not purchase, possess, have contact

9    with, or otherwise use any devise that can be connected to the

10   internet or used to store digital materials, other than that

11   approved by the U.S. Probation Office.  The Defendant must

12   allow the U.S. Probation Office to install software on any

13   approved device that is designed to record any and all

14   activity on the device the Defendant may use, including but

15   not limited to capture of key strokes, application

16   information, internet use history, email correspondence,

17   pictures and chat conversations.  The Defendant will pay any

18   costs related to the monitoring of their authorized devise,

19   including anyone in the Defendant's household that may use any

20   authorized device in question that monitoring software has

21   been installed.  If the Defendant needs access to an

22   employer-owned internet equipment device for employment

23   purposes, the Defendant must advise the Defendant's Probation

24   officer before using the device.  The Probation officer will

25   ensure the Defendant's employer is aware of the Defendant's

1    criminal history and that the Defendant must agree to use the

2    device for work purposes only.

3         The Defendant must not attempt to remove, tamper with, or

4    in any way circumvent the monitoring of software.  The

5    Defendant must disclose all online account information,

6    including usernames and passwords, to the U.S. Probation

7    Office.

8         The Defendant must also, if requested, provide a list of

9    all software/hardware on the Defendant's computer, as well as

10   telephone, cable, or internet service provider billing records

11   and any other information deemed necessary by the Probation

12   officer to monitor the Defendant's computer usage.

13        The Defendant must also refrain from [sic] purchase,

14   possess, or use of digital cameras, digital recorders, or any

15   other type of recording and/or photographic equipment.

16        The Defendant must not possess or view any images in any

17   form of media or any live venue that depicts sexually explicit

18   conduct.  For the purpose of this special condition of

19   supervision, the term sexually explicit conduct is defined

20   under 18 U.S.C. § 2256(2)(A), and is not limited in the sexual

21   exploitation of children.

22        Defendant must provide the Probation officer with access

23   to any requested financial information to determine if the

24   Defendant has purchased, viewed, or possessed sexually

25   explicit material.

1    The Defendant must submit to the search of Defendant's

2  person, property, house, residence, vehicle, papers, computer,

3  or other electronic communication or data storage devices and

4  media at any time with or without a warrant by any law

5  enforcement or Probation officer with reasonable suspicion

6  concerning unlawful conduct or a violation of the Defendant's

7  conditions of supervised release.

8    And then, Mr. O'Shea, would you like me to include

9  Seagoville or some other place or geographic location you

10  would like me to include for the service of his sentence.

11    MR. O'SHEA:  Your Honor, Seagoville.

12    THE COURT:  Okay.  I will include Seagoville.  It's

13  not binding on the Bureau of Prisons, but I will include that

14  in the judgment.

15    Now, sir, you -- I will also enter the final order of

16  forfeiture.  I think the preliminary order has been entered in

17  this case, so I'll enter the file.

18    And then, since you pled guilty without a plea agreement,

19  you have the right to appeal.  If you are unable to pay the

20  costs of an appeal, you may ask for the appeal informa

21  pauperis, which is without payment of fees.  The Clerk of the

22  Court will prepare and file a notice of appeal if you make the

23  request.  With few exceptions, any notice of appeal must be

24  filed within 14 days of the judgment being entered.

25    The presentence report is part of the record, and it's

1    already under seal.  It will remain under seal unless needed

2    for purposes of appeal.

3         I don't think there are any charges to dismiss.  He

4    pleaded open?

5              MS. MILLER:  That's correct.

6              THE COURT:  Okay.  Is there anything further from

7    the Government?

8              MS. MILLER:  Nothing further, Your Honor.

9              THE COURT:  Anything further from Defense?

10             MR. O'SHEA:  Your Honor, for the record we'll object

11   to the procedural and substantive unreasonableness of the

12   sentence.

13             THE COURT:  Understand.  Thank you.

14        So, sir, you will go back into the custody of the

15   Marshals pending your placement by the Bureau of Prisons.

16   Thank you.

17                       (End of hearing.)

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              03/16/2020

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25